**Gabriel FAGOT RODRIGUEZ, et al., Plaintiffs,**

v.

**The REPUBLIC OF COSTA RICA, et al., Defendants.**

**No. 93–2406 DRD.**

United States District Court, D. Puerto Rico.

Dec. 29, 1999.

Salvador Antonetti–Zequeira, Fiddler, Gonzalez & Rodriguez, San Juan, PR, A.J. Bennazar–Zequeira, A.J. Bennazar Law Offices, Hato Rey, PR, Heriberto J. Burgos–Perez, Fiddler, Gonzalez & Rodriguez, San Juan, PR, for Defendants.

Victor J. Casal–Vazquez, Hato Rey, PR, Jose G. Fagot–Diaz, Martinez Odell & Calabria, San Juan, PR, for Plaintiffs.

## OPINION AND ORDER

DOMINGUEZ, District Judge.

This case involves a landlord tenant dispute in which Plaintiffs, as landlords, allege that Defendants, including the Republic of Costa Rica ("Republic") and the Consulate of the Republic of Costa Rica ("Consulate"), are liable for rent and damages caused by the Consul and Vice Consul of Costa Rica in Puerto Rico while they were occupying plaintiffs' property as tenants. Now pending before the Court is Plaintiffs' motion for summary judgment in reconsideration seeking a determination by this Court that the Republic and the Consulate are not entitled to immunity under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C.A. § 1602 et seq.[1] (Docket No. 105). The Court has considered Plaintiffs' position in light of the record and finds as follows:

### I. Factual background:

On September 25, 1991, the Fagots and the Fourniers entered into a lease agreement whereby the Fagots agreed to lease to the Fourniers a residential property located in the neighborhood of Santa María in Río Piedras. The lease period was for two years, commencing on October 1, 1991, and ending on September 30, 1993, and required a monthly payment of $2,500.00, to be paid by the fifth day of every month. At the time of the lease Mrs. Hilda Fournier Alpiza and Mr. Angelo Antonio Greco Fournier served as Consul and Vice Counsul, respectively, of Costa Rica in Puerto Rico. Notwithstanding, the lease was signed by the Fourniers in their individual capacity, mentioning the Republic in only one clause which explains that the Fourniers, as consuls, receive from the Costa Rican government a monthly residential allowance of $2,000.00 and any increase in this amount would result in a proportional increase in the monthly rent paid to the Fagots. The lease also contained clauses stating that the property was to be used exclusively for residential purposes and could not be altered or subleased without the owner's written consent. Still, without seeking any consent or informing the Fagots, the Fourniers placed the Consulate of Costa Rica in the leased property.

That being the case, on June of 1993 the Fourniers failed to pay rent for the month of June. As a result, in a letter dated June 16, 1993, the Fagots notified the Fourniers that the lease was terminated and that the Fourniers had to vacate the premises by July 16, 1993. The Fourniers did not vacate the premises by the established date, however, and the following month the Fa-

---

1. On a hearing held on September 28, 1999, the Court granted Co-defendants twenty (20) days to oppose Plaintiff's motions. The Court finds an opposition which the Court considers filed prior thereto at Docket No. 97 dated September 25, 1996.

gots informed the Fourniers that for every month that the occupants remained in the property, the occupants would have to pay a monthly rate of $5,000.00. Still the Fourniers did not vacate the premises and on September 30, 1993, the Fagots filed the instant complaint for breach of contract, personal injury, damage or loss of property, eviction, and collection of money. Included as defendants in the complaint were the Fagots, the Republic, and the Consulate.[2]

On July 19, 1996, the Court entered default against the Fourniers for failure to comply with Court's orders, Docket No. 91, and partial summary judgment dismissing plaintiffs' complaint against the Republic and the Consulate for lack of jurisdiction under the FSIA, Docket Nos. 89 & 90. Thereafter, on August 5, 1996, Plaintiffs sought additional findings of fact and conclusions of law for reconsideration of the Court's partial summary judgment, Docket No. 92, and on March 27, 1997, the Court vacated its judgment of dismissal, Docket No. 102. Plaintiffs were then granted sixty (60) days to perform discovery on two exceptions to the FSIA's immunity: the tortious activity and the commercial activity exceptions. An opportunity to present a new motion for summary judgment with new legal arguments bearing on these exceptions was granted by the Court.

On April 2, 1997, Plaintiffs notified a request for admissions to Co-defendants the Republic and the Consulate. Co-defendants never responded to said request for admissions [3], thus, on July 16, 1997, the Court deemed the request for admissions accepted. See Marginal Order on Docket No. 104. As a result of said determination, the Court finds that the following additional facts are uncontested and considers them in adjudicating Plaintiffs' motion for summary judgment:

1. At all relevant times alleged in the Amended Complaint, the Consulate was Costa Rica's agent in Puerto Rico.

2. Plaintiffs are owners of the property leased by the Fourniers.

3. From 1991 to 1994 Hilda Fournier was Consul of Costa Rica in Puerto Rico.

4. From 1991 to 1994 Angelo Greco Fournier was Vice Consul of Costa Rica in Puerto Rico.

5. In September of 1991 the Fagots and the Fourniers signed a Lease Agreement in relation to the Fagot's property.

6. During the years 1991 to 1994 the Consulate was located in the Fagot's property.

7. The Consulate was placed in the Fagot's property by the Fourniers as consular officials of Costa Rica.

8. During the years 1991 to 1994 the Consulate appeared advertised in Puerto Rico's commercial and residential telephone books as being located in the Fagot's property.

---

**2.** It is not clear from the record when the Fagot's came to know that the Consulate of Costa Rica had been set up in their property. This date must be ascertained before the Court can determine a final ruling in this case, however, the date when the Fagot's learned of the Consulate's presence in their property is fundamental to the adjudication of liability upon the Republic and the Consulate. As will be discussed further ahead, under Puerto Rico law a principal may not be held liable for contracts entered into by his or her agent unless the third contracting party is somehow aware that the agent is acting on behalf of a principal and not merely in his or her own name. See *infra*.

**3.** During various status conferences counsel for the Republic advised the Court of experiencing difficulties and problems in communicating with the client, to the extreme that counsel requested to withdraw from legal representation in this case. (Docket No. 117). Although counsel for the Republic's diligence throughout the trial is unquestioned, the request for admissions to be answered by Defendants remained unanswered and by disposition of the Federal Rules of Civil R. 36(a) the request was deemed accepted by the Court.

9. During the years 1991 to 1994 the Consulate occupied and operated from within the Fagot's property.

10. During the years 1991 to 1994 Costa Rica occupied the Fagot's property.

11. Pursuant to official records, during the years 1991 to 1994 the Consulate was located in the Fagot's property.

12. During the years 1991 to 1994 all official government correspondence from Costa Rica to the Consulate or the Fourniers was sent to the Fagot's property.

13. During the years 1991 to 1994 Costa Rica knew the location of all of its Consulates, including Puerto Rico's.

14. During the years 1991 to 1994 Costa Rica knew that its Consulate in Puerto Rico was being operated from the Fagot's property.

## II. Standards for summary judgment

The function of summary judgment is "to pierce the boilerplate of the pleadings and examine the parties' proof to determine whether a trial is actually necessary." *Vega–Rodriguez v. P.R.T.C.*, 110 F.3d 174, 178 (1st Cir.1997). Accordingly, federal courts will grant summary judgment where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).

To defeat a motion for summary judgment the resisting party will have to show the existence of "a trial worthy issue as to some material facts." *Cortes–Irizarry v. Corporacion Insular*, 111 F.3d 184, 187 (1st Cir.1997). A fact is deemed "material" if the same "potentially affect[s] the suit's determination." *Garside v. Osco Drug Inc.*, 895 F.2d 46, 48 (1st Cir.1990). "An issue concerning such a fact is 'genuine' if a reasonable factfinder, examining the evidence and drawing all reasonable inferences helpful to the party resisting summary judgment, could resolve the dis-

pute in that party's favor." *Cortes–Irizarry*, 111 F.3d at 187. Nonetheless, "speculation and surmise, even when coupled with effervescent optimism that something definite will materialize further down the line, are impuissant on the face of a properly documented summary judgment motion." *Ayala–Gerena v. Bristol Myers–Squibb Co.*, 95 F.3d 86, 95 (1st Cir.1996) (citations omitted)

The movant for summary judgment, of course, must not only show that there is "no genuine issue of material facts," but also, that he is "entitled to judgment as a matter of law." *Vega–Rodriguez*, 110 F.3d at 178. Further, the court is required to examine the record "drawing all reasonable inferences helpful to the party resisting summary judgment." *Cortes–Irizarry*, 111 F.3d at 187. There is "no room for credibility determinations, no room for the measured weighing of conflicting evidence such as the trial process entails, no room for the judge to superimpose his own ideas of probability and likelihood ..." *Greenburg v. Puerto Rico Maritime Shipping Auth.*, 835 F.2d 932, 936 (1st Cir.1987). The facts must be examined under the above criteria because on a potential appeal the appellate court examines "the undisputed facts in the light most congenial to the appellants and adopts their version of any contested facts which are material to our consideration of the issues." *Vega–Rodriguez v. Puerto Rico Tel. Co.*, 110 F.3d 174, 178 (1st Cir.1997).

## III. Analysis

After examining the record and evaluating the facts in the light most favorable to the nonmoving party, it is evident that there are no genuine issues of material facts which prevent the Court from adjudicating Plaintiffs' motion for summary judgment. Thus, the Court proceeds to determine whether the Republic and the Consulate are entitled to immunity under the FSIA

██ "The FSIA is the exclusive source of subject matter jurisdiction over suits involving foreign states or their instrumentalities." *Joseph v. Office of Consulate General of Nigeria,* 830 F.2d 1018, 1021 (9th Cir.1987) (citations omitted). *See also Argentine Republic v. Amerada Hess Shipping Corp.,* 488 U.S. 428, 439, 109 S.Ct. 683, 690, 102 L.Ed.2d 818 (1989); *Saudi Arabia v. Nelson,* 507 U.S. 349, 355, 113 S.Ct. 1471, 1476, 123 L.Ed.2d 47 (1993); *Verlinden B.V. v. Central Bank of Nigeria,* 461 U.S. 480, 493, 494, 103 S.Ct. 1962, 1971–1972, 76 L.Ed.2d 81 (1983); *Randolph v. Budget Rent–A–Car,* 97 F.3d 319, 323 (9th Cir.1996). Under the FSIA, foreign states and their instrumentalities are presumed immune from the jurisdiction of the courts of the United States unless a specified exception to immunity applies. *Saudi Arabia,* 507 U.S. at 355, 113 S.Ct. at 1476; *Joseph,* 830 F.2d at 1021. Accordingly, plaintiffs suing a foreign state or its instrumentalities carry the burden of offering evidence that one of the FSIA's exceptions to immunity applies. Once the plaintiffs meet this burden, however, the party claiming immunity bears the burden of proving by a preponderance of the evidence that the exception does not apply. *Berdakin v. Consulado De La Republica De El Salvador,* 912 F.Supp. 458 (C.D.Ca.1995); *Joseph,* 830 F.2d at 1021.

██ It is uncontested that the Republic and the Consulate qualify as "foreign states" under the FSIA. *Joseph,* 830 F.2d at 1021; *Gerritsen v. de la Madrid Hurtado,* 819 F.2d 1511, 1517 (9th Cir.1987).

Notwithstanding, Plaintiffs claim and offer evidence suggesting that both the Republic and the Consulate are subject to this Court's jurisdiction because of the application of the commercial activity exception, 28 U.S.C.A. § 1605(a)(2), the immovable property exception, 28 U.S.C.A. § 1605(a)(4), and/or the tortious activity exception, 28 U.S.C.A. § 1605(a)(5)(A). The Court must examine each one of these exceptions and determine whether Plaintiffs' claims against the Republic and the Consulate fall within the purview of any of them. Before doing so, however, the Court must determine whether or not the Republic and the Consulate have engaged in any activity making them liable to the Fagots for it was the Fourniers who, in their personal capacity, signed the lease agreement with the Fagots. If the Court determines that there was some form of representative relationship between all Co-defendants, the Court will then proceed to decide whether or not it may exercise jurisdiction despite the FSIA's immunity.[4]

## A. Principal-agent relationship

If the Republic and the Consulate are to be exposed to liability in this case, it must be because the Republic and the Consulate are bound by the acts of the Fourniers. The potential for such binding to occur may stem from various theories, but none seems so convincing and clear as the existence of an agency relationship between all Co-defendants.

4. To determine the applicability of either the commercial activity or tortious activity exceptions, a court must first grapple with the substantive question of whether the foreign sovereign is liable for the actions of its agent: "the court must answer the initial question regarding the attribution of liability before it can find that it has subject matter jurisdiction over the foreign state pursuant to the FSIA." Sandra Engle, Note, Choosing Law for Attributing Liability Under the Foreign Sovereign Immunities Act: A Proposal for Uniformity, 15 Fordham Int'l L.J. 1060, 1076 (1992). This determination must be made pursuant to state law. *See, e.g., Randolph v. Budget Rent–A–Car,* 97 F.3d 319, 325 (9th Cir.1996) (applying forum state's law to determine whether alleged tortfeasor was employee of foreign sovereign whose activities therefore fell within section 1605(a)(5)); *First Fidelity Bank, N.A. v. Antigua & Barbuda–Permanent Mission,* 877 F.2d 189, 194–96 & n. 3 (2nd Cir. 1989) (assuming without deciding that state law applies to determination of whether ambassador's borrowing of money constituted Antigua's commercial activity, as well as to waiver inquiry); *Foremost–McKesson, Inc. v. Islamic Republic of Iran,* 905 F.2d 438, 452 (D.C.Cir.1990) (applying federal law to commercial activities exception inquiry).

Puerto Rico law generally does not impose liability upon one person for the acts of another person unless there exists a relationship of agency between the party acting and the party to be bound. Laws of P.R. Ann. tit. 31, § 5143. A relationship of agency exists where "a person binds himself to render some service, or to do something for the account or at the request of another." P.R. Laws Ann. tit. 31, § 4421. The agency relationship may be express or implied, "the latter being inferred from the acts of the agent," P.R. Laws Ann. tit. 31, § 4422, and may exist as to "one or more specific transactions." P.R. Laws Ann. tit. 31, § 4424. *See also* RESTATEMENT (SECOND) OF AGENCY 2d § 1 cmt. on subsection (1) (1958); *Grajales–Romero v. American Airlines, Inc.*, 194 F.3d 288 (1st Cir.1999); *Federal Savings and Loan Insurance Corporation v. Shearson–American Express Inc.*, 658 F.Supp. 1331 (D.P.R.1987).

The existence of an agency relationship is a question of fact generally left to be determined by a jury. *Torres v. National Association of Underwater Instructors*, 928 F.Supp. 134 (D.P.R.1996). In this case, however, there are on the record uncontested facts which allow the Court to reach a determination that an agency relationship did in fact exist between the Fagots, the Republic and the Consulate. Indeed, because Plaintiffs' request for admissions to the Republic and the Consulate has been deemed accepted for lack of a response by the Republic and the Consulate, the Republic and the Consulate have admitted that the Fourniers, as Consul and Vice Consul, were agents of the Republic and the Consulate and that the Fourniers set up the Consulate in the Fagots' property as consular officials. *See* Statement of Uncontested Facts ¶ 6, Docket No. 105. Hence, the Court finds that during all relevant time periods the

Fourniers acted as agents to the Republic and the Consulate.[5]

▉ Still, the existence of an agency relationship is not enough to impose liability upon a principal in every case. In cases seeking compensation of damages in tort, Puerto Rico's law of agency will hold the principal liable regardless of whether the agent has disclosed his agency, so long as there is a reasonable relationship between the acts of the agent and the principal's purposes, or if the agent is acting for the benefit of the principal. *Torres v. National Association of Underwater Instructors*, 928 F.Supp. 134 (D.P.R.1996); *Martinez Gomez v. Chase Manhattan Bank*, 108 D.P.R. 515, 1979 WL 59124 (1979). In cases where a party seeks compensation of damages in contract, however, Puerto Rico's Civil Code specifically states that "[w]hen an agent acts in his own name, the principal shall have no action against the person with whom the agent has contracted, nor the said persons against the principal. In such case, the agent is directly liable to the person with whom he has contracted, as if the transaction were his own." Laws of P.R. Ann. tit. 31, § 4426. *See also Satellite Broadcasting Cable Inc. v. Telefonica De Espana S.A.*, 786 F.Supp. 1089 (D.P.R.1992). Therefore, "where an agent acts on his own name, even though in reality he is no other than the representative of the principal, liability runs to him and not to the principal. Thus, it may be argued that in the case of undisclosed agencies, the agent is solely liable for contracts with third persons..." *Satellite Broadcasting*, 786 F.Supp. at 1103.

▉ Pursuant to the above, if the FSIA allows the Court's exercise of jurisdiction in this case, the Republic and the Consulate can be held liable for those tortious acts which the Fourniers engaged in as Consul and Vice Consul of the Republic.

5. The opening, establishment, and operation of a Consulate by a Consul may only be done by said official in his official capacity. Accordingly, even without Defendants' admissions, the Court must conclude that the Fourniers occupied the Fagots' property and established the Consulate in the Fagots' property as officials or employees of the Consulate.

These acts potentially may include the alteration of the property's structure in order to place an air conditioning unit, any damages caused to the property in the operation of the Consulate, and any damages or loss of property suffered by the Fagots as a consequence of the Consulate being established in the Fagots' property without obtaining the Fagot's consent.

■ The Republic's and the Consulate's liability in contract is not as clear. Plaintiffs themselves have admitted that the Fourniers signed the lease agreement in their personal capacity, without disclosing any intention of setting up the Consulate in the Fagot's property. Further, Plaintiffs have admitted that at the time the lease agreement was signed, the Fagot's did not know that the Fourniers were going to set up the Consulate in the leased property or that the Fourniers were acting in their representative capacity. Accordingly, under Puerto Rico's Civil Code and *Satellite Broadcasting,* even if the Fourniers were acting as representatives to the Republic and the Consulate when they first signed the lease agreement, the Republic and the Consulate cannot be held liable as principals under that contract. Notwithstanding, contractual liability under principles of agency and the doctrine of tacit relocation may be found against the Republic and the Consulate for each month to month contract entered into as of August 1993 and once the Fagots knew that the Consulate was occupying the leased premises and that the Fourniers were occupying the residence as agents to the Republic and the Consulate.[6] On this point, however, additional evidence is required before reaching an ultimate determination on the amount of damages owed. By September 30, 1993, the Fagots were obviously aware that the Fourniers were acting as agents to the Republic and the Consulate, for both were included as Co-defendants in the Complaint. Still, the

6. The principle of tacit relocation was discussed in detail in the Court's vacated judgment. There the Court explained that "an implied lease arises if at the end of the original lease term, the lessee remains on the premises for at least fifteen (15) days with the acquiescence of the lessor. The Puerto Rican jurisprudence identifies five requisite elements for tacit relocation: (1) that the parties be contractually related; (2) that the original lease expired; (3) that the lessee remain on the premises fifteen (15) days; (4) that such enjoyment of the premises be with the acquiescence of the lessor; and (5) that there should exist no express. or implied covenant barring such tacit relocation." Docket No. 89, pgs. 9–10 (footnote and citations omitted). The Court then determined that the doctrine of tacit relocation was inapplicable because the Republic and the Fagots were not contractually related. Notwithstanding, the Court now finds that the Republic and the Fagots were indeed contractually related by virtue of the contract entered into by the Republic's agents. The Court further finds that all the other requirements are met: in imposing a new monthly rent the Fagots implicitly acquiesced to the Defendants' enjoyment of the premises beyond the time period stated in the original contract; the original contract had clearly expired by the time the Fagot's acquiesced to the Defendants' continued occupation of the premises; the Defendants remained in the property well over fifteen (15) days; and there is no covenant barring a tacit relocation.

Still, because Puerto Rico law shields undisclosed principals from liability on contracts entered into by their agents, the Court must determine when the Fagots discovered that the Fourniers had established the Consulate in the Fagots' property. At this point this date is not clear nor undisputed. The Fagots state that they discovered the Fourniers' agency sometime after June 1993 and before September 30, 1993, but a narrower date is necessary in order impose contractual liability upon the Republic and the Consulate. If the Fagots discovered the Fourniers' role as agents before August 1993. all Defendants will be solidarily liable in the amount of $5,000.00 per each month that the Defendants remained in the property. If the Fagots did not make this discovery until the end of August or September 1993, the Republic and the Consulate will only be solidarily liable in the amount of $5,000.00 per each month after the Fagots discovered that the Fourniers had set up the Consulate in the premises. Accordingly, if the Court ultimately decides to exercise jurisdiction over this claim, the Fagots will have to offer specific evidence on this point. An ultimate determination of contractual damages may not be reached until said evidence has been offered.

Court must be placed in position to determine how much earlier the Fagots knew of the Fourniers' role as agents.

Having determined that an agency relationship existed between all Co-defendants and that the Republic and the Consulate are potentially liable for the lease contracts entered into by the Fourniers sometime between June and September 1993 and until October 1994, the Court now proceeds to examine whether the FSIA excludes jurisdiction over Plaintiffs' claims.

**B.   Commercial activity exception**

■ Section 1605(a)(2) of the FSIA provides in relevant part that "[a] foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case . . . (2) in which the action is based upon a commercial activity carried on in the United States by the foreign state." Thus, the commercial exception to the FSIA's immunity requires a two-prong analysis: (1) the alleged conduct must be a commercial activity; and (2) there must be a nexus between Plaintiff's action and the commercial activity. *See Saudi Arabia,* 507 U.S. at 356, 113 S.Ct. at 1477.

■ In determining whether a foreign state's conduct is such that it falls under the commercial activity exception, section 1603 mandates courts to focus on the nature, rather than the purpose, of the activity in question. That is, courts must focus only on "the particular conduct giving rise to the claim in question," not on "the defendant's generally commercial or governmental character." *Joseph,* 830 F.2d at 1023 (citations omitted). *See also Saudi Arabia,* 507 U.S. at 360, 113 S.Ct. at 1479. In fact, it is irrelevant that the defendant is a consulate or a foreign state as such, rather than a traditional commercial entity.

■ An activity is "commercial" if it "involves an agreement that might be made by a private person, notwithstanding the fact that the goods or services to be procured through the contract are to be used for a public purpose." *Meadows v. Dominican Republic,* 817 F.2d 517, 523 (9th Cir.1987). *See also Saudi Arabia,* 507 U.S. at 359–360, 113 S.Ct. at 1479; *Rush–Presbyterian–St. Luke's Medical Center v. Hellenic Republic,* 877 F.2d 574 575–578 (7th Cir.1989). An activity is public and "noncommercial" if it is one which only a sovereign can perform. *Saudi Arabia,* 507 U.S. at 360, 113 S.Ct. at 1479; *Joseph,* 830 F.2d at 1024.

■ In the specific case of a contract entered into by a Consulate for the lease of a residential property to be used by its representatives as a Consulate, the Ninth Circuit has held that "although the lease agreement at issue was not undertaken by the Consulate for profit, it nevertheless was a commercial transaction. [ . . . ] There is nothing about the lease agreement, or the alleged breach of that agreement, which distinguishes this transaction from an ordinary private commercial transaction, aside from the fact that the Consulate General of Nigeria was the tenant. Neither the Consulate's rental agreement, nor its alleged breach of that agreement, constitute sovereign activities. Therefore, contrary to the district court's decision, Joseph's breach of contract claim against Nigeria may be heard pursuant to the commercial activity exception." *Joseph,* 830 F.2d at 1024. (Citations omitted). Further, the legislative history of the FSIA specifically includes the lease of property by a foreign government as an example of a commercial activity. *See* H.R.Rep. No. 1487, 94th Cong., 2d Sess. 16, reprinted in 1976 U.S.Code Cong. & Admin. News 6604, 6615.[7]

7. "The fact that only a sovereign state can use property for a consulate has no bearing on the question of the consulate's immunity under 1605(a)(2), because that goes to the purpose of the transaction, rather than its nature." *Berdakin v. Consulado De La Republica De El Salvador,* 912 F.Supp. 458, 462 (C.D.Ca.1995). "The question is not whether the foreign government is acting with a profit motive or instead with the aim of fulfilling

The particular conduct allegedly engaged in by the Republic and the Consulate through their agents, the Consul and Vice Consul, consists of entering a month to month lease contract for the amount of $5,000.00, not paying that lease despite continued occupation from August 1993 to October 1994, and altering the structure and causing damages to the Fagot's property while the Consulate was operated from the property. These claims all arise out of the breach of the parties' lease agreement, and thus, are rooted in a commercial activity as defined by the FSIA. Thus, the Court finds that defendants have engaged in a commercial activity.

Further, because Plaintiffs' claims obviously arise from Defendants' alleged breach of the lease agreement and damages to the leased structure, the Court also finds that Plaintiffs have met the nexus requirement, the second prong of the commercial activity exception, *Saudi Arabia,* 507 U.S. at 356, 113 S.Ct. at 1477.

Accordingly, the Court finds that it possesses jurisdiction to entertain Plaintiffs' claims for damages arising out of breach of contract and the resulting collection of money.[8] If Plaintiffs are able to prove that the above month to month lease contract was entered into with the knowledge that the Fourniers were acting as agents to the Republic and the Consulate, Plaintiffs' claims against the Republic and the Consulate must proceed.

## C. Tortious activity exception

■ The tortious activity exception provides United States courts with jurisdiction for cases not otherwise encompassed in the commercial activity exception, "in which money damages are sought against a foreign state for. . . damage to or loss of property, occurring in the United States and caused by the tortious act or omission of that foreign state or of any official or employee of that foreign state while acting within the scope of his office or employment; except this paragraph will not apply to. . . (A) any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function regardless of whether the discretion be abused." 28 U.S.C.A. § 1605(a)(5). Thus, the tortious activity exception allows a foreign state to be held liable for tortious acts committed by the foreign sovereign itself or by the foreign sovereign's officials or employees, so long as those acts were not committed by the officials or employees while performing or failing to perform a discretionary function.

In this case Plaintiffs invoke the tortious activity exception on two separate grounds. First, Plaintiffs allege that the Fourniers caused structural damages to

uniquely sovereign objectives. Rather, the issue is whether the particular actions that the foreign state performs (whatever the motive behind them) are the type of actions by which a private party engages in trade and traffic or commerce." *Id. See also Republic of Argentina v. Weltover, Inc.,* 504 U.S. 607, 614, 112 S.Ct. 2160, 2166, 119 L.Ed.2d 394 (1992); *Los Angeles News Service v. Conus Communications Company Ltd. Partnership,* 969 F.Supp. 579, 586 (C.D.Ca.1997).

8. The Court's conclusion on this point is consistent with the overall policies underlying the commercial activity exception. As other courts have noted, "the commercial activity exception rests on the theory that where a state enters into a commercial contract with a private party, the private party's interest in bringing suit is particularly great and the state's interest in immunity correspondingly

small. Subjecting the state to suit does not affront its sovereign status and hence is unlikely to cause friction. Where a state enters into a contract that is sovereign in nature, however, the balancing of interests is different. The private party could not have entered into a similar contract with other private parties and has no legitimate expectation of being able to bring suit on the contract. Correspondingly, the state's interest in immunity is great since the contract involves its intrinsically sovereign activities. Subjecting the state to suit under these circumstances is likely to touch on 'national nerves.' Consequently, the FSIA mandates that the breach of such contracts, like the contracts themselves, be considered sovereign in nature." *de Sanchez v. Banco Central de Nicaragua,* 770 F.2d 1385, 1394–1395 (5th Cir.1985).

the Fagots' property during the time the Fourniers were occupying the property as Consul and Vice Consul to the Republic. Second, Plaintiffs allege that the Republic and the Consulate trespassed their property by establishing a Consulate within the property without first seeking the Fagot's consent. Both of these claims, however, are based on acts committed by the Fourniers as officials or employees, thus, the Court proceeds to discuss the tortious activity exception as applied to acts committed by officials or employees of a foreign sovereign.

■ As the commercial activity exception, application of the tortious activity exception to a suit against a foreign sovereign for those acts committed by the sovereign's officials or employees hinges on a two-pronged test. That is, before exercising jurisdiction in the case, the Court must find: (1) that the tortious acts of the individual official or employee of the sovereign were undertaken within the scope of employment; and (2) that the claim is not based upon the exercise or failure to exercise a discretionary function. *Joseph*, 830 F.2d at 1025; *MacArthur Area Citizens Ass'n v. Republic of Peru*, 809 F.2d 918, 921 (D.C.Cir.), modified on other grounds, 823 F.2d 606 (D.C.Cir.1987).

■ The "scope of employment" provision of the tortious activity exception requires a finding that the doctrine of respondeat superior applies to the tortious acts of individuals. *Joseph*, 830 F.2d at 1025. This determination is governed by state law, in this case, Puerto Rico's law. *Id. See also First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 622 n. 11, 103 S.Ct. 2591, 2598 n. 11, 77 L.Ed.2d 46 (1983). Essentially, Puerto Rico's law establishes as a fundamental consideration that the employee's acts "furthered a desire to serve and benefit the employer's interest, resulting in an economic benefit to the employer." *Borrego v. United States*, 790 F.2d 5, 7 (1st Cir.1986); citing *Martinez v. Comu-*

*nidad*, 90 D.P.R. 461, 1964 WL 14313 (1964) and *Llorens v. Lozada*, 73 D.P.R. 271, 1952 WL 8040 (1952). An employee will thus be found to be acting with the "scope of employment" upon an evaluation of the following three (3) factors:

(1) desire to serve, benefit, or further the employer's business or interest;

(2) that the act is reasonably related to the scope of employment; and

(3) that the agent has not been prompted by purely personal motives.

*Id. See also Rodriguez v. United States*, 328 F.Supp. 1389, 1391 (D.P.R.1971); *Attallah v. United States*, 955 F.2d 776, 782 (1st Cir.1992); *Perez Rodriguez v. Sauri*, 84 D.P.R. 500, 503–504, 1962 WL 14889 (1962).

Plaintiffs allege that the Fourniers caused structural damages to the Fagot's property while the Fourniers were occupying the same and operating the Consulate. Plaintiffs also allege that Defendants caused these damages while furthering the Consulate's interest and not for personal motives. Finally, Plaintiffs allege that they have suffered damages as a result of the Consulate's unauthorized operation and trespass into the leased property. If Plaintiffs' allegations are true. undoubtedly the scope of employment prong of the tortious activity exception will have been met and the Republic and the Consulate will be liable to suit unless it can be demonstrated that the Fourniers caused the structural damages while performing a discretionary function. If Plaintiffs' allegations are not true and the Republic and the Consulate can demonstrate that the Fourniers damaged the Fagots' property in furtherance of personal motives, the Republic and the Consulate will not be liable to suit for those damages. Consequently, the Court must examine the second prong of the tortious activity exception in order to ascertain whether there is any possibility that the Republic and the Consulate can be held liable in this Court.

■ The discretionary function prong of the tortious activity exception is generally analyzed under the principles developed for the FTCA's discretionary function exception. *Olsen v. Government of Mexico*, 729 F.2d 641, 646–647 (9th Cir.1984). Therefore, to determine whether the discretionary function exception applies to a claim under the FSIA, courts must apply the two-pronged test developed by the Supreme Court for the FTCA's discretionary function exception. Pursuant to *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 813, 104 S.Ct. 2755, 2764, 81 L.Ed.2d 660 (1984), the Court must first examine "the nature of the conduct, rather than the status of the actor." *Id.* The Court must then inquire whether the governmental acts at issue were "grounded in social, economic and political policy." *Id.* In other words, "the court should avoid second-guessing policy decisions through the medium of a tort action. The execution of policy decisions by subordinates, even those subordinates at the operational level, comes under the discretionary function exception if the acts involved the exercise of policy judgment." *Joseph*, 830 F.2d at 1026. (Citations omitted).

■ In *MacArthur Area Citizens Association v. Republic of Peru*, 809 F.2d 918 (D.C.Cir.), a neighborhood association sued the Republic of Peru for damages because of the unsightly nature of certain structural alterations made to the Republic's property for security reasons relating to the operation of a chancery. The district court dismissed the suit stating that "establishing a chancery... to conduct foreign relations is a discretionary public policy decision and... this decision undergirds the specific acts which the Association bewails." *Id.* at 922 as cited in *Joseph*, 830 F.2d at 1026. The Court then found that the decision to purchase and modify the chancery building was made in order to implement the determination to establish the chancery. The Court concluded that these measures involved a policy judgment and were therefore protected by the discretionary function exception.[9]

Like the court in *MacArthur*, this Court finds that if the Fourniers were acting within the scope of employment when they altered the Fagot's property, the Fourniers did so in order to implement their determination to establish a Consulate in the Fagot's property. Whether establishing said Consulate in the Fagot's property was right or not, the fact is that the Fourniers were exercising a discretionary function which renders inapplicable to Plaintiffs' claim for structural damages the tortious activity exception to the FSIA. Accordingly, be it because the Fourniers were furthering personal interests when they damaged the Fagots' property or because they did so while performing a discretionary function, this Court lacks jurisdiction to entertain Plain-

---

9. In discussing *MacArthur, Joseph* modified the D.C. District Court's holding by stating that *"MacArthur* does not indicate that the purely destructive acts which give rise to Joseph's tort clams were discretionary. Destruction of property can hardly be considered as part of a policy decision to establish a consular residence." *Joseph*, 830 F.2d at 1027.

*Joseph*, however, is distinguishable from the case at hand. In *Joseph* Plaintiff claimed that the tenants had removed property from the house and had left the premises severely damaged. As an example of these damages the Plaintiff apparently alleged "extensive damage to appliances, fixtures, solid wood doors, the glass shower door; removal of shutters and drapes from thirty-three windows, removal of fully grown trees; the removal of wood framing from windows and floor boards, the removal of a built in barbecue." *Id.* at 1020 n. 1. In the case bar there are no comparable allegations of severe damage to the Fagot's property. The Fagot's simply claim that the Fourniers caused damages including excessive wear and tear to various areas of the house, damage to trees and the lawn as well as the alteration of a structural wall. It seems to the Court that these allegations do not amount to the allegations of "purely destructive acts" present in *Joseph* and, thus, the *Joseph* court's effort at distinguishing *MacArthur* is unnecessary in this case.

tiffs' claims for structural damages against the Republic and the Consulate.

 However, actions for trespass do not fall under the discretionary function exception to the FTCA, *Hatahley v. U.S.*, 351 U.S. 173, 76 S.Ct. 745, 100 L.Ed. 1065 (1956), and it is uncontested that in this case the Consulate was established in the Fagot's property without the Fagot's consent and in open contradiction to the lease agreement signed by the Fourniers. Thus, the Court has jurisdiction to entertain Plaintiffs' claims for damages suffered as a consequence of the Consulate trespass into the leased property.

### D. Immovable property exception

Because of the above determinations that the Court has jurisdiction to entertain Plaintiffs' claim for damages as a result of the Consulate's trespass into the Fagot's property and Plaintiffs' claims for collection of money owed for rent, the Court finds it superfluous and unnecessary to decide whether the FSIA's immovable property exception is applicable to this case.

### IV. Conclusion

After an analysis of Plaintiffs' claims and the applicable law, the Court concludes that the FSIA's immunity does not extend to Plaintiffs' claims for damages from trespass and for collection of rent owed from June/September 1993 until October 1994, after Plaintiffs knew that the Consulate had been established in their property. The Court is not in position at this time to establish the specific amount in which the Fagot's must be compensated for either of these claims, accordingly, the determination will be left for adjudication after trial.

Plaintiffs' motion for summary judgment is **GRANTED.** (Docket No. 105).

Plaintiffs and Defendants are granted until February 25, 2000, to perform discov-

ery as to damages. The issues have been limited by the Court. **No extensions will be granted. No further dispositive motions are to be filed. Pretrial is to be held on March 17, 2000, at 9:00 a.m.**[10]

IT IS SO ORDERED.

---

**10.** The individual liability of the Fourniers and damages caused to the Fagots remains under advisement having the Court held a default hearing.