**Dilma PAGÉS–RAMÍREZ,
et al., Plaintiffs**

**v.**

**HOSPITAL ESPAÑOL AUXILIO
MUTUO DE PUERTO RICO,
INC., et al., Defendants.**

**Civil No. 07–1407 (JP).**

United States District Court,
D. Puerto Rico.

May 14, 2008.

David Efron, Esq., Alberto J. Pérez–Hernández, Esq., Alejandro J. Fernández–Muzaurieta, Esq., David Efron Law Offices, San Juan, PR, for Plaintiffs.

Juan Antonio Pedrero–Lozada, Esq., Arroyo, Monrouzean & Associates, Miguel G. Laffitte, Esq., Delgado & Fernández, María Z. Trigo–Ferraiuoli, Esq., SIMED, San Juan, PR, Eugene F. Hestres–Vélez, Esq., Eugene F. Hestres–Rodríguez, Esq., Bird, Bird & Hestres, Old San Juan, PR, for Defendants.

### *OPINION AND ORDER*

JAIME PIERAS, JR., Senior District Judge.

### I. *INTRODUCTION*

Plaintiffs Dilma Pagés–Ramírez ("Pagés"), Michael Pietri–Pozzi ("Pietri"), the conjugal partnership between them, and their child Giovanni Pietri–Pagés ("baby Giovanni") (collectively, "Plaintiffs"), brought the instant action alleging medical malpractice against Defendant Dr. Antonio Ramírez–Gonzalez ("Ramírez"), and his insurer, Insurers Syndicate for the Joint Underwriting of Medical–Hospital Professional Liability Insurance ("SIMED"), pursuant to P.R. Laws Ann. tit. 31, Sections 5141–5142, and P.R. Laws. Ann. tit. 26, Section 2003, for the injuries sustained by Giovanni during his birth.[1]

A trial began in this case before the Court on May 1, 2008. Upon Plaintiffs' resting of their case, Defendant Ramírez moved under Rule 50(a) of the Federal Rules of Civil Procedure for Judgment as a Matter of Law. The Court considered the oral arguments presented by both parties pursuant thereto, and verbally granted Defendant Ramírez's motion in open court. The Court informed the parties that its verbal Order may be followed by a written Opinion and Order. For the reasons stated herein, Defendant Ramírez's oral motion for Judgment as a Matter of Law is **GRANTED.**

### II. *FACTUAL ALLEGATIONS*

On May 19, 2005, Plaintiff Pagés, age thirty-three, arrived at Hospital Español Auxilio Mutuo at her thirty-sixth week of pregnancy to deliver her baby, Giovanni. Defendant Ramírez was the physician in charge of Plaintiff Pagés' care during pregnancy, and he was the attending physician at the birth. Defendant Ramírez had served as Plaintiff Pagés physician for her three prior pregnancies. During the delivery of baby Giovanni, Plaintiffs allege that Giovanni suffered or acquired profound multi-organ damage, respiratory failure, sepsis, asphyxia, and seizures. Due to the alleged negligence of Defendant Ramírez during Plaintiff Pagés' prenatal care and delivery, Plaintiff Giovanni was born with severe birth defects including cerebral palsy. Plaintiff Giovanni remained hospitalized at Hospital Español Auxilio Mutuo until August 5, 2005, when he was transferred to San Jorge Children's Hospital to continue treatment.

Plaintiffs make numerous claims that Defendant Ramírez departed from the standard of care for physicians, including 1) failing to record measurements of the uterine fundus throughout the birth, 2) failing to elicit a comprehensive obstetrical history from a high risk patient, 3) failing to estimate the fetal weight and to enter same in the delivery record, 4) proceeding with labor and delivery with incomplete prenatal record, 5) attempting a mid-pelvic delivery by vacuum extraction, especially where the heart monitor showed a problematic pattern, 6) failing to place an internal fetal heart monitor, 7) failing to monitor the baby's heart rate, 8) failing to

---

**1.** Plaintiffs reached a confidential settlement with Defendant Hospital Español Auxilio Mutuo and its insurer, Admiral Insurance Company, prior to trial.

timely call for a cesarean-section delivery, 9) failing to timely perform a cesarean-section delivery, and 10) failing to timely diagnose and treat the baby's fetal distress.

Plaintiffs allege that, as a result of Defendant Ramírez's departures from medical standards, baby Giovanni is catastrophically injured, with severe brain damage and physical abnormalities that are permanent and incapacitating. This has caused Plaintiffs Pagés and Pietri to suffer emotional anguish. Due to Plaintiffs' limited economic resources, baby Giovanni allegedly has not been able to receive sufficient quality medical care or therapy.

Defendant Ramírez argues that he complied with the generally accepted standards of care for physicians during his treatment of Plaintiffs Pagés and Giovanni. He further argues that Plaintiffs failed to demonstrate a causal link between any acts or omissions taken by Defendant Ramírez and the injuries sustained by baby Giovanni.

## III. *FINDINGS OF FACT*

1. Dilma Pagés Ramírez and her husband Michael Pietri Pozzi are the parents of Giovanni Pietri Pagés.

2. Hospital Español Mutuo de Puerto Rico, Inc. is a Puerto Rico corporation, with its principal place of business in Puerto Rico. It owns and operates a hospital of the same name located in San Juan.

3. Defendant Ramírez is a medical doctor who intervened in the pre-natal care and labor and delivery of Plaintiff Pagés and her son Giovanni. Defendant Ramírez is a resident of Puerto Rico.

4. Defendant Ramírez was Plaintiff Pagés' obstetrician for her pregnancy with Giovanni.

5. Plaintiff Pagés received prenatal care through her private physician, Defendant Ramírez.

6. At all times relevant to this case, Defendant Ramírez was a duly licensed physician with a speciality in obstetrics and gynecology, authorized to practice medicine in the Commonwealth of Puerto Rico, who had privileges to practice obstetrics and gynecology at Defendant Hospital Auxilio Mutuo.

7. At the time relevant to the facts of this case, Defendant Ramírez had a medical malpractice policy number PRM–10714 (March 2, 2007 to March 2, 2008, retroactive March 2, 2001), issued by Insurers Syndicate for the Joint Underwriting of Medical–Hospital Professional Liability Insurance (SIMED), with limits of $100,000.00 per medical incident. Said policy is subject to its own terms, limits, conditions and restrictions.

8. By October 22, 2004, Plaintiff Pagés, then thirty-three years old, visited Defendant Ramírez' office for a prenatal evaluation. She was six weeks pregnant at the time.

9. Plaintiff Pagés referred a history of four pregnancies and one previous abortion to Defendant Ramírez.

10. Plaintiff Pagés was instructed to return for follow-up in three weeks.

11. Her estimated due date was set for June 13, 2005.

12. Plaintiff Pagés again visited Defendant Ramírez for her pregnancy with Giovanni on December 17, 2004.

13. Plaintiff Pagés made subsequent visits to Defendant Ramírez on February 9, March 14, March 18, April 22 and May 12, 2005. On her May 12, 2005 visit, Plaintiff Pagés was said to be thirty-five weeks pregnant. Her

expected due date was changed to June 1, 2005.

14. Plaintiff Pagés arrived at Defendant Hospital Auxilio Mutuo on May 19, 2005, at 2:09 p.m., in active labor, with a diagnosis of intrauterine pregnancy at thirty-six weeks of gestation.

15. Laboratory work was performed upon Plaintiff Pagés' admission to Defendant Hospital Auxilio Mutuo.

16. Also on May 19, 2005, at 3:00 p.m, Plaintiff Pagés was admitted to the labor room. On vaginal examination, the cervix was ninety percent effaced and six cm dilated with the vertex at the negative two station. The patient's blood pressure was 110/70 and her contractions were every 6 minutes.

17. Also on May 19, 2005, by 4:30 p.m., there had been no change in the findings on vaginal examination. Intravenous pitocin was running at a rate of one milli unit/minute and her contractions were every five minutes. The membranes were artificially ruptured at 4:45 p.m., discharging clear fluid, and epidural anesthesia was begun.

18. Also on May 19, 2005, at about 5:37 p.m., the baby's fetal heart rate went down. Pagés was placed on her right side and the baby's heart rate went up to 120 beats per minute.

19. Also on May 19, 2005, at 6:00 p.m., the vaginal examination revealed the cervix to be eight cm dilated with the vertex at the negative one station. The pitocin was running at a rate of two milli units/minute and the contractions were every three minutes.

20. Also on May 19, 2005, by 6:45 p.m., the cervix was said to be fully dilated and the vertex at the negative two station. The patient was placed in the lithotomy position and the peritoneal lavage was effected. An attempt at vacuum extraction was carried out without success.

21. A spinal anesthesia was attempted but changed to general anesthesia due to unavailability to perform spinal.

22. Also on May 19, 2005, baby Giovanni was delivered at 7:55 p.m. by Ramírez via low transverse cesarean-section. He weighed 9 lbs. 4 ounces and had an Apgar score of 2/7. The baby did not cry, did not have good muscular tone, was cyanotic, and his heart rate was 120 beats/minute. He was described as macrosomic.

23. Baby Giovanni was assisted by a neonatologist who proceeded to intubate him and to transfer him to the Hospital's Neonatal Intensive Care Unit.

24. When baby Giovanni was transferred to the Neonatal Intensive Care Unit, he was placed on a ventilator.

25. Baby Giovanni's umbilical cord was sent to the laboratory for cord gases and the pH was 6.92, the bicarbonate was 20.2, the $pCO_2$ was ninety-seven and the base excess was -12.6.

26. After delivery, Plaintiff Pagés developed uterine atony, requiring the transfusion of four units of blood. She remained hospitalized until May 24, 2005.

27. Baby Giovanni remained at the Hospital until August 5, 2005, when he was transferred to San Jorge Children's Hospital to continue treatment.

28. The discharge summary at Defendant Hospital Auxilio Mutuo indicates the following diagnoses for baby Giovanni:

R/O Aspiration—Gastric Content

Atelectasis

Birth Asphyxia

Gastroesophageal reflux

Hypertonia

Hypocalcemia—neonatal
Hypokalemia
Hyponatremia
R/O Inborn Error of Metabolism
Jitteriness
Nutritional Support
Perinatal Depression
Poor feeder
Psychosocial Intervention
Renal Dysfunction
Respiratory Failure
Respiratory Insufficiency
Seizures
Sepsis-newborn
Term Infant
Urinary Tract Infection-newborn

## IV. ANALYSIS

█ In order to succeed on their medical malpractice claim under Article 1802 of the Puerto Rico Civil Code, P.R. Laws Ann. tit. 31, section 5141–42, Plaintiffs bear the burden of establishing, by a preponderance of the evidence: (1) the duty owed; (2) an act or omission transgressing that duty; and (3) a sufficient causal nexus between the breach and the harm. *See Rivera v. Turabo Med. Ctr. P'ship,* 415 F.3d 162, 167 (1st Cir.2005). In a medical malpractice case such as this, Puerto Rico law holds physicians to a national standard of care. *Cortés–Irizarry v. Corporación Insular de Seguros,* 111 F.3d 184 (1st Cir. 1997) (internal citations omitted). As such, a physician has a duty to use the same degree of expertise as could reasonably be expected of a typically competent physician in the identical specialty under identical or similar circumstances, regardless of regional variations in professional acumen or level of care. *Id.*

█ Puerto Rico law presumes that a doctor observes a reasonable standard of care in treating a patient, so a plaintiff has the burden of refuting this presumption. *Rolón–Alvarado v. Municipality of San*

*Juan,* 1 F.3d 74, 78 (1st Cir.1993). To do so, the plaintiff must first establish the physician's duty of care. Because medical knowledge and training are critical to demonstrating the parameters of a physician's duty, the minimum standard of acceptable care is almost always a matter of informed opinion. Thus, it must ordinarily be established by expert testimony. *Id.,* citing *Oliveros v. Abreu,* 1 P.R. Offic. Trans. 293, 315, 101 D.P.R. 209 (1973); *see also Lama v. Borrás,* 16 F.3d 473, 478 (1st Cir.1994) (holding that "the trier of fact can rarely determine the applicable standard of care without the assistance of expert testimony").

### A. Plaintiffs' OB/GYN Expert

In this case, Plaintiffs argue that Defendant Ramírez breached the duty of care required by obstetrician/gynecologists ("OB/GYN") under Puerto Rico law, resulting in injuries to Plaintiff Giovanni Pietri–Pagés ("baby Giovanni") during his birth. Plaintiffs announced Dr. Bernard Nathanson ("Dr. Nathanson") as their OB/GYN expert. Dr. Nathanson was expected to testify as to the standard of care for OB/GYNs in Puerto Rico, as well as to Defendant Ramírez's departures from these standards during the birth of baby Giovanni. This testimony was anticipated to serve as foundation testimony for later experts to provide a causal link between Defendant's actions and the resulting damages to Plaintiffs.

Prior to presenting Dr. Nathanson's testimony, Plaintiffs first presented the testimony of their fact witnesses, Dilma Pagés–Ramírez and Michael Pietri–Pozzi, on Friday, May 2, 2008. Said witnesses' testimony concluded at approximately 11:45 a.m., and the Court ordered Plaintiffs to call their first expert witness. Dr. Nathanson would be presented at Plaintiffs' first expert witness. Counsel for Plaintiffs moved

the Court to call a lunch recess so that their first expert, whose testimony was expected to be somewhat lengthy, could begin after lunch without interruption. However, it soon became obvious to the Court that Plaintiffs' expert witness was not present in the courtroom and ready to testify, and Plaintiffs admitted as much.

After the lunch recess, the parties met with the undersigned in chambers. Plaintiffs informed the Court that they would be calling Dr. Allan Hausknecht ("Dr. Hausknecht") and not Dr. Nathanson as their first expert witness. Dr. Hausknecht was announced by Plaintiffs in their Initial Scheduling Conference Memorandum and their Pre–Trial Memorandum as an expert in neurology. He was anticipated to serve as Plaintiffs' damages expert. Defendant objected to the order of Plaintiffs' expert witnesses, arguing that by allowing Plaintiffs' damages expert to testify before their liability expert, the jury could infer that liability had already been established when in fact Plaintiffs had not yet presented their expert witness on this issue. Defendant argued that allowing Dr. Hausknecht to testify before Dr. Nathanson would prejudice his case.

In response, Plaintiffs informed the Court for the first time that Dr. Nathanson was ill at his home in New York with an unidentified stomach illness. Although Dr. Nathanson was supposed to travel to Puerto Rico earlier in the week—on April 30, 2008—to prepare for the trial, he had not done so. Plaintiffs informed the Court that Dr. Nathanson should be traveling to Puerto Rico over the weekend—May 3 and 4, 2008. As such, the Court dismissed the jury for the day, with the understanding that Plaintiffs' would present Dr. Nathanson as their first expert witness on Monday, May 5, 2008, to be followed by Dr. Hausknecht.

On Monday morning, Plaintiffs informed the Court that Dr. Nathanson had not come to Puerto Rico to testify. They claimed that his unidentified stomach illness had continued throughout the weekend, rendering him unable to travel. Plaintiffs presented two documents to the Court regarding the alleged illness of the witness: a receipt for a plane ticket from New York to Puerto Rico, and a self-serving note from Dr. Nathanson himself explaining his absence.[2] Plaintiffs did not request a continuance of the trial as a result of Dr. Nathanson's absence, nor did they move the Court for permission to use another OB/GYN expert witness.

Instead, Plaintiffs moved the Court to allow the testimony given by Dr. Nathanson at his deposition to be read to the jury pursuant to Rule 32 of the Federal Rules of Civil Procedure and Rule 804 of the Federal Rules of Evidence. The Court issued an Order (No. 113) denying this motion on the following grounds: (1) Plaintiffs failed to demonstrate and substantiate a valid illness, (2) Dr. Nathanson's testimony in the deposition that he had "no opinions on causation" would confuse the jury without further explanation, and (3) the deposition testimony given by Dr. Nathanson was based on a preliminary report and an incomplete set of documents in his possession, thereby preventing Defendant from conducting a thorough cross-examination.

Plaintiffs moved for reconsideration of this Order on May 6, 2008, presenting the Court with a note from Dr. Nathanson's alleged treating physician.[3] The Court found the note unconvincing, given that the treating physician had not personally

---

2. These documents are attached to this Opinion and Order as Exhibit A.

3. Attached hereto as Exhibit B.

examined Dr. Nathanson and did not provide any explanation regarding his illness or inability to travel. Plaintiffs' oral motion for reconsideration was verbally denied. Once again, Plaintiffs did not ask the Court for a continuance, or for leave to use a different OB/GYN expert in Dr. Nathanson's absence.

### B. Plaintiffs' Neurology Expert

The Court allowed Plaintiffs to call Dr. Hausknecht to the stand, but limited his testimony to his field of expertise: neurology. As such, he was not allowed to testify as to OB/GYN standards of care, departures from these standards, or causation. Before Dr. Hausknecht's testimony began, the jury was given an instruction that although they would hear testimony on baby Giovanni's damages, they should not infer liability from said testimony. Dr. Hausknecht proceeded to testify about Giovanni's present condition and his expected future prognosis and cost of care. Dr. Hausknecht showed baby Giovanni to the jury and demonstrated certain notable physical features and motor limitations. As ordered by the Court, Dr. Hausknecht provided no testimony regarding OB/GYN standards of care, Defendant Ramírez's alleged departures from those standards, of the cause of baby Giovanni's injuries.

### C. Plaintiffs' Neonatology Expert

Plaintiffs' next witness was Dr. Carolyn Crawford ("Dr. Crawford"), a specialist in pediatrics and neonatal/perinatal medicine. Upon Defendant's motion, the parties conducted a *Daubert* inquiry of Dr. Crawford outside the presence of the jury to determine the scope of her testimony. *See Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Dr. Crawford testified that she was not board-certified in OB/GYN, and that she had no privileges to administer pitocin to a patient or to perform a cesarean section. She further testified

that although she serves as a consultant at high-risks births, it is the OB/GYN who actually delivers the baby and makes the final decisions regarding the delivery.

Accordingly, the Court ruled (No. 114) that Dr. Crawford's testimony be limited to exclude any testimony regarding OB/GYN standards of care, departures from OB/GYN standards of care, and causation. As with Dr. Hausknecht, the jury was again instructed not to infer that liability had yet been established because they were hearing testimony regarding damages. Dr. Crawford testified about the medical conditions apparent from baby Giovanni's birth, and the testing that he underwent during his first few months.

### D. Defendant Ramírez Called as Adverse Witness

Upon the conclusion of Dr. Crawford's testimony, Plaintiffs called Defendant Ramírez to the stand. Before Defendant Ramírez was allowed to testify, the Court informed the parties of the relevant Federal Rules of Evidence pertaining to the examination of adverse witnesses. Counsel for Defendant Ramírez informed the Court that Defendant Ramírez required the assistance of an interpreter for his testimony. Although Plaintiffs announced in the Joint Proposed Pre–Trial Order that they would provide interpreters for their witnesses, they failed to provide one for Defendant Ramírez's use. As no interpreter was otherwise present in the courtroom, the Court ruled that it would cause an unnecessary delay to wait for an interpreter to arrive to enable the witness to testify. As such, Defendant Ramírez did not testify as a witness for Plaintiffs.

### E. Plaintiffs' Expert in Life Care Planning

Plaintiffs then called Gerri Pennachio ("Pennachio"), a life care planner, as their

next witness. Defendant Ramírez orally moved the Court to exclude this witness on two grounds. First, Defendant argued that Pennachio's testimony would not be relevant pursuant to Rules 401 through 403 of the Federal Rules of Evidence. The anticipated testimony of Pennachio pertained only to damages. As no evidence of liability had yet been presented, Defendant argued that allowing the witness to testify would be irrelevant and a waste of the Court's time.

Defendant also argued that Plaintiffs failed to plead special damages pursuant to Rule 9(g) of the Federal Rules of Civil Procedure. As such, Defendant argued that Plaintiffs should be excluded from presenting a witness whose testimony focused entirely on special damages to award to baby Giovanni as a result of his injuries. Defendant argued that Plaintiffs had ample opportunity to plead special damages, as Plaintiffs had amended their complaint once on other issues, but that they failed to do so, as required by Rule 9(g).

Plaintiffs responded with an argument to the Court stating, *inter alia*, that Defendant's motion was untimely. The Court took both arguments into consideration. The Court then verbally held that Pennachio's testimony would be continued to a later time, if allowed at all, once the Court ruled on whether evidence of liability and causation had been presented.

### F. *Dr. Carlos Roure Called as Adverse Witness*

Finally, Plaintiffs called as a witness Dr. Carlos Roure ("Dr. Roure"), who was announced by Defendant Ramírez as his OB/GYN expert witness. Defendant Ramírez objected to Plaintiffs' use of this witness, arguing that Plaintiffs were attempting to elicit expert testimony regarding standards of care, departures from standards of care, and causation from this witness because they were unable to produce their own OB/GYN expert. Defendant also argued that this witness was not announced by Plaintiffs. Plaintiffs responded that in the Joint Proposed Pre–Trial Order (No. 62), they "reserve[d] the right to use as their own any witness announced by Defendants."

After hearing arguments from both sides on the matter, the Court granted Defendant's oral motion to prohibit Plaintiffs from calling Dr. Roure as an expert witness (No. 116). The Court held that Plaintiffs failed to follow the instructions set forth by the Initial Scheduling Conference Order (No. 26), which required them to name any additional witnesses on or before February 19, 2008.[4] Because Plaintiffs did not name Dr. Roure by this date, the mere generic reservation of "any witness announced by Defendants" did not suffice for the late addition of this witness.

Plaintiffs then rested their case.

### G. *Defendants' Motion for Judgment as a Matter of Law*

 Upon conclusion of Plaintiffs' case, Defendant Ramírez moved for judgment as a matter of law pursuant to Rule 50(a)(2) of the Federal Rules of Civil Procedure, arguing that Plaintiffs failed to provide any expert testimony pertaining to OB/GYN standards of care, departures from these standards, or causation.

After hearing oral arguments from both sides on this issue, the Court orally held that Plaintiffs failed to establish, through expert testimony, the standards of care for OB/GYNs and Defendant's departures therefrom. Specifically, Plaintiffs failed to

---

4. This Order also required the parties to provide additional information about any proposed witnesses, such as the address of the witness, and a short statement as to the subject matter of their testimony.

prove, by a preponderance of the evidence, that Defendant Ramírez departed from the standards of care in the OB/GYN profession, thereby proximately causing injury to baby Giovanni during his birth.

Plaintiffs failed to present the relevant standards in the OB/GYN field pertaining to the delivery of babies like Giovanni, and whether Defendant Ramírez departed from those standards. Plaintiffs also failed to provide evidence demonstrating why baby Giovanni was born with severe birth defects. Although Plaintiffs presented evidence pertaining to baby Giovanni's damages, there was no evidence presented showing that those damages were caused by any act or omission of Defendant Ramírez. Further, there is no evidence that baby Giovanni's condition would be improved if Defendant Ramírez had acted differently. As such, the Court cannot send this case to the jury, because doing so would invite speculation as to the degree of care exercised by Defendant Ramírez, as well as the cause of baby Giovanni's injuries.

## V. *CONCLUSION*

In conclusion, the Court holds that the jury would not have a legally sufficient evidentiary basis to find for the Plaintiffs, and **GRANTS** Defendant's oral motion for Judgment as a Matter of Law. The Court will enter a separate judgment accordingly, dismissing Plaintiffs' claims against Defendant Ramírez with prejudice.

Although the Court announced its decision to grant Defendant's Rule 50 motion in Court on May 7, 2008, this written Opinion and Order, along with the corresponding Final Judgment, shall serve as the Final Judgment for appellate purposes.

**IT IS SO ORDERED.**

Exhibit A

## BERNARD N. NATHANSON, M.D.

395 RIVERSIDE DRIVE
NEW YORK, NY 10025
Telephone (212) 861-1417

May 4, 2008

David Efron, Esq.
P.O. Box 29314
San Juan, P.R. 00929-0314

**Via Fax: (787) 724-3702**

Dear Mr. Efron:

I regret exceedingly my inability to testify at the Pages trial in Puerto Rico this week. My primary physician (Robert Roven, M.D.) has advised me in the strongest terms to avoid air travel owing to a multiplicity of significant medical conditions that have temporarily immobilized me.

Pursuant to the above, I shall endeavor to obtain from Dr. Roven a letter attesting to the foregoing as soon as he returns from his holiday.

Regretfully,

Bernard N. Nathanson, M.D.

*7*Windows Live™

## Invoice
From: **Patty** (pnimer@wyllys.webmail.com)
Sent: Wed 4/30/08 7:47 PM
To: davidefron@hotmail.com

April 30, 2008

Invoice:

Dr. Nathanson

JFK/SJU 30 April ( coach class)
SJU/JFK 7 May

Invoice # 16502
Total $ 733.80

Thank you

Pat Nimer
Lead Agent

## Exhibit B

**Robert B. Roven, M. D.**
654 Madison Avenue
New York, NY 10065
.....
tel: 212-371-8516
fax: 212-355-4244

5ᵗʰ May 2008

To Whom It May Concern:

Re: Bernard N. Nathanson, M. D.

I have been the primary care physician of Dr. Nathanson for many years. Recently he has developed multiple serious medical conditions, which in my opinion make it most inadvisable for him to travel.

Yours truly,

*Robert B. Roven, MD*
Robert B. Roven, M. D.

RBR:rr.