# United States Court of Appeals
## For the First Circuit

No. 20-1937

EULALIA LÓPEZ-RAMÍREZ; LAURA CRISTINA GAUDIER-LÓPEZ,

Plaintiffs, Appellants,

v.

DR. MARÍA M. TOLEDO-GONZÁLEZ; CENTRO MÉDICO DEL TURABO, INC.,
d/b/a Hospital HIMA San Pablo Caguas,

Defendants, Appellees,

GUSTAVO J. NOGALEZ-PÉREZ; CONJUGAL PARTNERSHIP TOLEDO-NOGALES;
UNKNOWN MONITORING COMPANIES AND/OR UNKNOWN NEUROPHYSIOLOGICAL
MONITORING COMPANIES A, B AND C; JOHN DOES 1, 2 AND 3; A, B AND
C CORPORATIONS; UNKNOWN INSURANCE COMPANIES, A THROUGH H; NEXT
STEP MEDICAL CO. INC.; BROMÉDICON, INC.,

Defendants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Raúl M. Arias-Marxuach, U.S. District Judge]

Before

Barron, Chief Judge,
Thompson and Kayatta, Circuit Judges.

David Efron, with whom Law Offices of David Efron, P.C. was
on brief, for appellants.
Jeannette López de Victoria, with whom Oliveras & Ortiz, PSC
was on brief, for appellee Dr. María M. Toledo-Gonzáles.
Roberto Ruiz Comas, with whom RC Legal & Litigation Services,
PSC was on brief, for appellee Centro Médico del Turabo, Inc.,

d/b/a Hospital HIMA San Pablo Caguas.

_____

April 28, 2022

_____

**BARRON, <u>Chief Judge</u>**.  This appeal is from a grant of summary judgment against Eulalia López-Ramírez ("López"), in the medical malpractice suit that she, joined by her daughter, brought under Puerto Rico law in the United States District Court for the District of Puerto Rico.  The suit seeks recovery in connection with the brain surgery that was performed on López to alleviate her facial spasms.  We affirm.

## I.

We begin with a description of the undisputed facts and the procedural history.  We then provide some of the relevant legal background to set the stage for the analysis to follow.

## A.

López had been suffering for approximately eighteen years from facial spasms -- specifically, "right hemifacial spasms."  She had stopped responding to Botox treatment.

To address the spasms, López visited a neurosurgeon, Dr. Maria M. Toledo González ("Dr. Toledo"), on September 29, 2015.  Dr. Toledo recommended surgery after a "Brain MRI scan" revealed that a blood vessel abutted López's right facial nerve. The surgery would involve entering López's skull using a procedure known as a "right retrosigmoid craniotomy" and then surgically moving the offending blood vessel away from the nerve, or "decompressing" the nerve, in a process known as "microvascular decompression."

- 3 -

López consented to having the surgery performed at Hospital HIMA (the "Hospital").[1] During the surgery, which occurred on January 26, 2016, Dr. Toledo used a process the parties described as "neuromonitoring" to determine, using equipment, whether her manipulation of the nerves and blood vessels was causing any irritation or damage to the nerves.

Later that day, after the surgery had been completed, López was "[b]arely able to raise [her] eyebrow" and could not fully close her eye. Her condition worsened until, a few days later, Dr. Toledo confirmed that López could "not hear anything" in her right ear, had full right facial paralysis, and was "in a wheelchair due to lack of balance." Further testing revealed greater damage.

**B.**

On December 23, 2016, López and her daughter brought this lawsuit in the District of Puerto Rico against Dr. Toledo, the Hospital, and various other defendants. The operative complaint claimed that the defendants failed to provide López "with

---

[1] The record does not contain López's written consent to the surgery, and although the parties' experts mention a consent form, they dispute whether that document constituted evidence of an informed consent to the surgery. Although the plaintiffs referred to an alleged inadequacy in the consent in the joint pretrial conference report, they did not advance any argument concerning the consent in their briefing in opposition to Dr. Toledo's motions to exclude their expert testimony and for summary judgment.

- 4 -

adequate neurological evaluation and treatment during her surgery and stay in the hospital" or the "consultations" and "treatments" necessary to "avoid a massive stroke," and that these failures "constituted gross negligence." The complaint further claimed that the defendants "deviat[ed] from accepted medical practices" by "performing surgery without identifying, isolating and protecting the nerve and vascular tissue in the affected area," by "fail[ing] to timely diagnose the devastating neurological damage in process," and by "fail[ing] to provide adequate monitoring in the process to identify the risks and multiple perforations to the cerebral artery."

The complaint claimed that the defendants' negligence in providing medical care to López made them liable to her and her daughter under Puerto Rico Laws title 31, Sections 5141 and 5142. The complaint sought economic and non-economic damages, including for López's "severe physical and emotional pain and suffering," and her daughter's "severe emotional suffering."[2]

## C.

To establish a "prima facie case" of negligence under Puerto Rico Laws title 31, Section 5141, the plaintiffs must

---

[2] Because the District Court, at the plaintiffs' request, dismissed all claims against all defendants except for Dr. Toledo and the Hospital, those two parties were the only defendants that remained at the time that the District Court issued the order that the plaintiffs appeal. We hereafter use the term "defendants" to refer to only Dr. Toledo and the Hospital.

establish: "(1) the duty owed (i.e., the minimum standard of professional knowledge and skill required in the relevant circumstances), (2) an act or omission transgressing that duty, and (3) a sufficient causal nexus between the breach and the claimed harm." Cortés-Irizarry v. Corporación Insular De Seguros, 111 F.3d 184, 189 (1st Cir. 1997). With respect to a negligence claim that alleges medical malpractice, "Puerto Rico holds health care professionals to a national standard of care." Id. at 190. In addition, for such claims, "Puerto Rico law presumes that physicians exercise" the reasonable level of care. Id. The plaintiffs "bear[] the burden of refuting this presumption." Rolon-Alvarado v. Municipality of San Juan, 1 F.3d 74, 78 (1st Cir. 1993). Thus, "a plaintiff bent on establishing a breach of a physician's duty of care ordinarily must adduce expert testimony to limn the minimum acceptable standard and confirm the defendant doctor's failure to meet it." Cortés-Irizarry, 111 F.3d at 190.

Against this legal backdrop, the plaintiffs proposed to introduce at trial the testimony of "an expert in neurology," Dr. Allan Hausknecht ("Dr. Hausknecht"), to support their claim that there had been a breach of the applicable standard of care during López's surgery. In addition, the plaintiffs "reserve[d] the right to use as their own any expert witness announced by defendants" in support of their negligence claims. The defendants proposed in response to introduce the testimony of their own expert

witness: Dr. Ricardo H. Brau Ramírez ("Dr. Brau"), an "expert in neurosurgery."

Federal Rule of Evidence 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. In addition, Federal Rule of Civil Procedure 26 requires that a party seeking to admit expert witness testimony must submit "a written report" that "must contain:"

> (i) a complete statement of all opinions the witness will express and the basis and reasons for them;
> (ii) the facts or data considered by the witness in forming them;
> (iii) any exhibits that will be used to summarize or support them;
> (iv) the witness's qualifications, including a list of all publications authored in the previous 10 years;
> (v) a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and
> (vi) a statement of the compensation to be paid for the study and testimony in the case.

Fed. R. Civ. P. 26(a)(2)(B).

The parties stated in a joint pretrial conference report filed on July 12, 2018, that each side would produce an expert report describing its respective expert's analysis. The plaintiffs produced two reports from Dr. Hausknecht that purported to describe his expert opinion and the basis for it.

The first of those reports set forth Dr. Hausknecht's analysis of the surgery that had been performed on López by Dr. Toledo. The report explained that it was Dr. Hausknecht's opinion both that Dr. Toledo had failed to properly "isolate" and "protect" López's nerves and blood vessels during the surgery and that this failure caused her injuries. The second of those reports, which was dated approximately one month after the first, detailed the results of Dr. Hausknecht's own "comprehensive neurological examination" of López, as well as her medical history and post-surgical symptoms.

The defendants produced their own expert report from their proposed expert, Dr. Brau. Dr. Brau's report explained that it was his expert opinion that Dr. Toledo followed the applicable standard of care despite the unfortunate surgical outcome.

A little over a year later, Dr. Toledo filed a motion under Federal Rule of Evidence 702 and Federal Rule of Civil Procedure 26(a)(2)(B) to "strike Dr. Hausknecht as an expert, or at least his opinion that Dr. Toledo committed medical malpractice." The Hospital joined that motion. Attached to the

motion as exhibits were both of Dr. Hausknecht's expert reports and a full transcript of Dr. Hausknecht's deposition testimony.

The motion contended, among other things, that Dr. Hausknecht's opinion in the report assumed negligence based only on the negative outcome of the surgery and that his opinion thereby relied on a "res ipsa loquit[ur]" theory of negligence. As the District Court explained, that theory "is a torts doctrine 'providing that, in some circumstances, the mere fact of an accident's occurrence raises an inference of negligence that establishes a prima facie case.'" López Ramírez v. Grupo HIMA San Pablo, Inc., No. 16-3192, 2020 WL 365554, at *5 n.2 (D.P.R. Jan. 22, 2020)(quoting Res Ipsa Loquitur, Black's Law Dictionary (11th ed. 2019)). The motion asserted that Puerto Rico law has foreclosed that theory of negligence in medical malpractice cases. The motion thus contended that Dr. Hausknecht's testimony -- or, at least, his opinion regarding Toledo's malpractice -- was inadmissible pursuant to Federal Rule of Evidence 702.

The motion separately identified two additional reasons to strike Dr. Hausknecht's "report and expected testimony," "or at least his opinion that Dr. Toledo committed medical malpractice." The motion argued first that Dr. Hausknecht's report did not include the statement of his compensation required by Federal Rule of Civil Procedure 26(a)(2)(B). The motion also argued that he

was not qualified to serve as an expert pursuant to Federal Rule of Evidence 702 because he was "a neurologist, not a neurosurgeon."

Approximately two months later, following a final pretrial conference, the District Court stated in a minute entry that it entered on the docket that it was "incline[d] to hear the testimony of [Dr. Hausknecht] out of the presence of the Jury pursuant to [Federal Rule of Evidence] 104."[3]  But, the District Court, without first having held such a hearing, then later issued an opinion and order striking "[Dr.] Hausknecht's proffered expert opinions regarding the standard of care and Dr. Toledo's alleged negligence."  López Ramírez, 2020 WL 365554, at *6.

The District Court explained in its opinion that it was rejecting the defendants' contentions that Dr. Hausknecht's opinions must be struck under Federal Rule of Civil Procedure 26 because Dr. Hausknecht failed to include in his expert report a statement of his compensation and under Federal Rule of Evidence 702 because he was not qualified as an expert.  Id. at *5.  The District Court nonetheless determined that Dr. Hausknecht's proffered expert opinions concerning, respectively, the applicable standard of care and Dr. Toledo's "deviation from" it must be struck pursuant to Federal Rule of Evidence 702.  Id. at *6.  The

---

[3] Federal Rule of Evidence 104 provides, "The court must decide any preliminary question about whether a witness is qualified . . . .  In so deciding, the court is not bound by evidence rules, except those on privilege."  Fed. R. Evid. 104(a).

- 10 -

District Court also ruled that Dr. Hausknecht's deposition did not salvage either of those opinions for purposes of Rule 702, because the deposition was "equally unhelpful, reiterating that Mrs. López's results 'can only be explained by improper procedure' despite listing other causes for similar injuries." Id.

That same day, the District Court issued an order for Dr. Toledo "to file a motion for summary judgment" within three weeks. Dr. Toledo thereafter filed the motion, which the Hospital joined. The plaintiffs contended in response that they could prove their case even without Dr. Hausknecht's testimony as to his proffered expert opinions, because they could rely on the testimony of the defendants' expert, Dr. Brau. "In the alternative," the plaintiffs requested that the District Court reconsider its prior ruling striking Dr. Hausknecht's testimony and, "in the best interest of procedural and substantive justice," allow Dr. Hausknecht to testify to the opinions regarding the applicable standard of care and Dr. Toledo's alleged negligence.

The District Court denied the plaintiffs' request for reconsideration, granted Dr. Toledo's motion for summary judgment, dismissed the plaintiffs' claims with prejudice, and entered judgment in favor of all remaining defendants. See López Ramírez v. Grupo HIMA San Pablo, Inc., No. 16-3192, 2020 WL

5351851, at *1, *6, *8 (D.P.R. Sept. 4, 2020).  The plaintiffs then filed this timely appeal of that summary judgment order.[4]

## II.

We first address the plaintiffs' challenges to the District Court Order striking Dr. Hausknecht's proffered opinions under Federal Rule of Evidence 702.  Because we find no merit to those challenges, we then address the plaintiffs' separate grounds for challenging the District Court's grant of summary judgment in favor of the defendants.[5]

## A.

As the Supreme Court of the United States explained in Daubert v. Merrell Dow Pharmaceuticals, Inc., Federal Rule of Evidence 702 assigns a "gatekeeping role for the judge" to "ensur[e] that an expert's testimony both rests on a reliable

---

[4] The plaintiffs' appeal from the District Court's entry of summary judgment against them permits us to consider their challenge to the District Court's predicate order striking Dr. Hausknecht's opinions. See Martínez-Serrano v. Quality Health Servs. of P.R., Inc., 568 F.3d 278, 283 (1st Cir. 2009) (explaining that when an appellant "designate[s] the final judgment in a case as the appeal's object . . . such a notice of appeal is deemed to encompass not only the final judgment but also all interlocutory orders that merge into it").

[5] The plaintiffs also appear to assert that the District Court imposed "too severe of a sanction" by excluding Dr. Hausknecht's opinions.  But, even assuming that challenge is sufficiently developed for us to consider, it has no merit, because the District Court excluded Dr. Hausknecht's opinions pursuant to Federal Rule of Evidence 702 and not as a sanction for the plaintiffs' failure to comply with Federal Rule of Civil Procedure 26.

foundation and is relevant to the task at hand."  509 U.S. 579, 597 (1993).  "The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate."  Id. at 595.  "So long as an expert's scientific testimony rests upon '"good grounds," based on what is known,' it should be tested by the adversarial process, rather than excluded for fear that jurors will not be able to handle the scientific complexities." Milward v. Acuity Specialty Prods. Grp., Inc. (Milward I), 639 F.3d 11, 15 (1st Cir. 2011) (internal citation omitted) (quoting and citing Daubert, 509 U.S. at 590, 596).

"There is an important difference between what is unreliable support and what a trier of fact may conclude is insufficient support for an expert's conclusion."  Id. at 22. Thus, "[w]hen the factual underpinning of an expert's opinion is weak, it is a matter affecting the weight and credibility of the testimony -- a question to be resolved by the jury."  Id. (quoting United States v. Vargas, 471 F.3d 255, 264 (1st Cir. 2006)).

Nonetheless, "nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert.  A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."  Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997). So long, that is, as that gap is not "of the district court's

- 13 -

making." Milward I, 639 F.3d at 22 (quoting Kennedy v. Collagen Corp., 161 F.3d 1226, 1230 (9th Cir. 1998)).

"The party seeking to introduce the evidence has the burden of establishing both its reliability and its relevance." Milward v. Rust-Oleum Corp. (Milward II), 820 F.3d 469, 473 (1st Cir. 2016) (citing Daubert, 509 U.S. at 593 n.10). "We review the district court's decision to admit or exclude expert testimony for abuse of discretion," reviewing "[p]redicate factual findings" for "clear error" and "pure questions of law . . . de novo." Id. at 472; see also Joiner, 522 U.S. at 146.

The District Court struck the proffered opinions of Dr. Hausknecht on two independent grounds under Federal Rule of Evidence 702. See López Ramírez, 2020 WL 365554, at *6. First, the District Court ruled that the plaintiffs failed to meet their burden to show that Dr. Hausknecht had provided sufficient support for the standard of care that he identified as being applicable to the surgery in question. Id. Second, the District Court concluded that the plaintiffs failed to meet their burden to show that Dr. Hausknecht supportably had explained the basis for his opinion that Dr. Toledo had deviated from the applicable standard of care, insofar as Dr. Hausknecht had identified one. Id. As we will explain, the District Court did not abuse its discretion in ruling that the plaintiffs failed to meet their burden to show that Dr. Hausknecht's opinion that Dr. Toledo deviated from the

- 14 -

applicable standard of care during the surgery rested on more than res ipsa loquitur, which is a theory of negligence that the parties in this case agree is not one that the plaintiffs may rely upon under Puerto Rico law. We thus need not address the District Court's other ground for striking Dr. Hausknecht's testimony. Id.

Dr. Hausknecht stated in his expert report that the applicable standard of care required a neurosurgeon performing the type of surgery at issue to "identify, isolate, and protect" the nerves and blood vessels in the brain. But, the District Court concluded, Dr. Hausknecht failed to "specify[] . . . why" the "standard of care applicable to Mrs. López's case" was "not met." Id.

The District Court noted in so concluding that Dr. Hausknecht in his report "acknowledg[ed] the 'textbook' nature of the operative report," which was a written summary of the operation that Dr. Toledo signed, and the "inherent risks of the surgery." Id. Indeed, according to both experts' summary of that operative report, Dr. Toledo found during the surgery that there were multiple perforators -- or small arteries that supply blood to the brain -- coming out of a larger artery, the Anterior Inferior Cerebellar Artery (AICA), and that the facial nerve had been irritated. Moreover, according to both experts' summary of the operative report, Dr. Toledo, after finding as much, decided

not to decompress any contact points between the nerve and AICA, to withdraw from the area, and to conclude the surgery.

The District Court then went on to explain that, notwithstanding Dr. Hausknecht's description of the operative report as "'textbook,'" Dr. Hausknecht did not "provide any data to sustain or explain the conclusory finding that there was a deviation from the standard of care." Id. Moreover, the District Court determined that "[a]lthough Dr. Hausknecht's report state[d] that he included copies of journal articles that" he stated "'may be helpful,' he fail[ed] to name them or relate the content of said publications to his assertion that Dr. Toledo was negligent." Id. For these reasons, the District Court concluded that there was "'simply too great an analytical gap' between the content of the report and the opinion proffered." Id. (quoting Joiner, 522 U.S. at 146).

The plaintiffs do not identify any statement in Dr. Hausknecht's report that undermines the District Court's assessment. Dr. Hausknecht's report states that "[o]bviously, damage to the[] perforators did occur secondary to some activity during the surgery." But, the plaintiffs do not identify -- and we do not see -- where in the report Dr. Hausknecht explains the basis for concluding that there was a deviation from the standard of care. There is instead only the conclusory statement that

"[t]hese structures were not properly identified, isolated and protected."

For example, Dr. Hausknecht's report does not state that Dr. Toledo touched a nerve or vessel that she should not have touched, given the applicable standard of care. His report also does not address whether or how Dr. Toledo could have avoided manipulating any nerves or vessels. Nor does Dr. Hausknecht's report reject the possibility, as Dr. Brau states in his competing report, that this is a procedure in which "manipulation of the blood vessels" cannot be avoided because "[t]his operation is designed to mobilize blood vessels away from the facial nerve." In sum, Dr. Hausknecht's report sets forth his opinion that Dr. Toledo was not sufficiently careful with respect to "structures" without specifying in what respect Dr. Toledo manipulated a "structure" in a manner that deviated from the standard of care that he had identified.

As the plaintiffs point out, Federal Rule of Evidence 702 "has been interpreted liberally in favor of the admission of expert testimony." Levin v. Dalva Bros., Inc., 459 F.3d 68, 78 (1st Cir. 2006). But, the plaintiffs have not identified anything more in the record than the conclusory statements Dr. Hausknecht made in his report that opined that Dr. Toledo deviated from the standard of care -- statements that

do not attempt to describe the principles or methods by which he reached that opinion.

Moreover, the plaintiffs do not develop any contention that Dr. Hausknecht's deposition testimony -- which, we note, the District Court also considered but found "equally unhelpful," López Ramírez, 2020 WL 365554, at *6 -- bridges the "analytical gap" that the District Court identified between Dr. Hausknecht's stated opinion in his report that there had been a deviation from the standard of care and the basis for that opinion. Id. (quoting Joiner, 552 U.S. at 146). On appeal, the plaintiffs refer to Dr. Hausknecht's deposition only to show that he was qualified to speak to the standard of care itself. But, the District Court did not dispute that he was qualified to do so.[6] See López Ramírez, 2020 WL 365554, at *5.

---

[6] The plaintiffs did, after oral argument, submit a letter pursuant to Federal Rule of Appellate Procedure 28(j) to which they attached the publications that they contended Dr. Hausknecht relied on when he stated in his report that various articles he did not name "may be helpful in understanding [his] final opinions and conclusions." The plaintiffs also included a list of the titles and authors of these publications in their brief to us on appeal. But, it remains the case that Dr. Hausknecht's reference in his report to the unnamed articles does not mention how those articles address the "analytical gap" between his conclusion and the explanation for it that formed the basis for the District Court's exclusion of his expert opinion. López Ramírez, 2020 WL 365554, at *6 (quoting Joiner, 522 U.S. at 146). The plaintiffs' brief to us on appeal and the post-argument letter purporting to attach those unnamed articles do not do so either. Nor did the plaintiffs attempt to do so in their brief in opposition to Dr. Toledo's motion in limine to exclude Dr. Hausknecht's testimony.

- 18 -

The plaintiffs do emphasize that Puerto Rico law permits a party seeking to prove negligence in a medical malpractice case to demonstrate disputed facts "by indirect or circumstantial evidence." But, the plaintiffs fail to show how Dr. Hausknecht's report provides any circumstantial or inferential basis for his opinion that Dr. Toledo's actions manipulated "structures" in a manner that deviated from the standard of care.

In sum, after reviewing the expert reports and the arguments made to us regarding the record in this case and the relevant law, we see no abuse of discretion in the District Court's order excluding Dr. Hausknecht's expert opinion that Dr. Toledo deviated from the applicable standard of care in performing the surgery on López that is the predicate for her suit. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990). Thus, the plaintiffs' challenge to the grant of summary judgment fails insofar as it depends on a challenge to the District Court's exclusion of the relevant opinions proffered by Dr. Hausknecht pursuant to Federal Rule of Evidence 702.

**B.**

We turn, then, to the plaintiffs' contention that, even if the District Court did not err in striking Dr. Hausknecht's expert opinion regarding the deviation from the standard of care, the District Court erred in granting summary judgment to the defendants. "To defeat a motion for summary judgment, the

- 19 -

nonmoving party must demonstrate the existence of a trialworthy issue as to some material fact," i.e., a fact that "potentially could affect the suit's outcome." Cortés-Irizarry, 111 F.3d at 187; see also Borges ex rel. S.M.B.W. v. Serrano-Isern, 605 F.3d 1, 5 (1st Cir. 2010). That requires that a plaintiff "affirmatively point to specific facts" that do so. Feliciano-Muñoz v. Rebarber-Ocasio, 970 F.3d 53, 62 (1st Cir. 2020) (quoting McCarthy v. Nw. Airlines, Inc., 56 F.3d 313, 315 (1st Cir. 1995)). Our review is de novo. Milward II, 820 F.3d at 472-73.[7]

**1.**

The plaintiffs rely for this contention in part on what the expert report that the defendants themselves filed in support of their expert, Dr. Brau, showed. The District Court determined, however, that summary judgment was "proper even after reading Dr. Brau's report in the light most favorable" to the plaintiffs. López Ramírez, 2020 WL 5351851, at *7 (quotation marks and citation omitted). We see no basis for ruling otherwise.

The District Court explained that, although "Dr. Brau's report did not directly question or contradict Dr. Hausknecht's standard of care . . . to identify, isolate, and protect nervous

---

[7] The plaintiffs in their briefing to us on appeal do not develop any independent argument as to why the District Court erred in granting summary judgment to the Hospital in particular, aside from citing to the general allegations contained in their complaint. They have therefore waived any such argument. See Zannino, 895 F.2d at 17.

- 20 -

tissue," Dr. Brau's report set forth the conclusion that there was "not even a trace of evidence in the medical chart that Dr. Toledo failed to identify, isolate, and protect the nervous tissue and vascular structure in this case."  Id. (emphasis and citations omitted).  The District Court further explained that, because the plaintiffs' claim that Dr. Brau may have left certain opinions out of his report was "speculative at best," that conclusion did "not create a factual dispute for purposes of summary judgment."  Id. (emphasis and citation omitted).

In response on appeal, the plaintiffs contend only that "Dr. Brau's testimony and cross-examination[] will help the jury to determine both the proper standards of care and the causal nexus between Defendants' negligence and Plaintiffs' damages" and that the District Court "erred" in rejecting that argument.  But, we are not persuaded.

Dr. Brau states in the report that "Dr. Toledo followed the standard of care" and "took all precautions" to "minimize the risks"; that "[i]t is highly improbable that direct surgical trauma to the nerves or the brainstem occurred during surgery"; and that there "is not even a trace of evidence in the medical chart that Dr. Toledo failed to identify, isolate, and protect the nervous tissue and vascular structure in this case."  The plaintiffs do not explain how or why Dr. Brau's testimony would, despite these statements, lend support to their case.  Nor do they identify any

statements in Dr. Brau's report that might support a finding that there remains a material dispute as to whether there was a deviation from the standard of care. See Tropiagas de P.R., Inc. v. Certain Underwriters at Lloyd's of London, 637 F.3d 53, 56 (1st Cir. 2011).

Indeed, Dr. Brau's report describes specific surgical decisions that Dr. Toledo made that are consistent with Dr. Brau's opinion that Dr. Toledo did not deviate from the standard of care. For example, the report states that Dr. Toledo "altered the dissection of the Facial Nerve" when "she was notified that some electrical changes were recorded" and "stopped the mobilization of" the blood vessel, the AICA, "when the nerve became irritated." The report also states that "[n]o hemorrhage, rupture, or tear of the perforators, AICA or the Vertebral Arteries occurred," and that "[t]he estimated blood loss for the procedure" was "below the average blood loss for this procedure." And, while Dr. Brau reserved the right to "modify, alter, amend, or change" his opinion, the plaintiffs have failed to point to any facts that might demonstrate how Dr. Brau's testimony might change, let alone whether such a change would support their case.

## 2.

The plaintiffs' final ground for challenging the grant of summary judgment in favor of the defendants relies on an exception to the general rule "that in a medical malpractice case

under Puerto Rico law 'a factfinder normally cannot find causation without the assistance of expert testimony.'" Martínez-Serrano v. Quality Health Servs. of P.R., Inc., 568 F.3d 278, 286 (1st Cir. 2009) (quoting Rojas-Ithier v. Sociedad Española de Auxilio Mutuo y Beneficiencia, 394 F.3d 40, 43 (1st Cir. 2005)). That general rule rests on the understanding that "medical malpractice is a field in which the issues tend to be scientifically driven and more nuanced than in most tort cases," id., and that "Puerto Rico law presumes that physicians exercise reasonable care." Cortés-Irizarry, 111 F.3d at 190.

As the plaintiffs point out, we have recognized that some medical malpractice cases brought under Puerto Rico law may involve alleged conduct "sufficiently blatant or patent" to permit a negligence claim to survive summary judgment without an expert witness; in such cases, the nature of the alleged error in treatment is such that "lay persons, relying on common knowledge and experience, can legitimately recognize or infer negligence." Rolon-Alvarado, 1 F.3d at 79. But, although the plaintiffs contend that theirs is such a case, we cannot say that the District Court erred in determining that the plaintiffs had not "proffer[ed] evidence that Dr. Toledo's conduct was 'sufficiently blatant or patent' that" a lay person "could infer that her negligence caused Mrs. López's current state." López Ramírez, 2020 WL 5351851, at *8 (quoting Rolon-Alvarado, 1 F.3d at 79).

The plaintiffs do assert in arguing otherwise that even Dr. Brau "agrees that [López]'s injuries resulted from the surgical manipulations performed by" Dr. Toledo and that a jury could, on its own, determine that those manipulations were of the avoidable and negligent kind. But, insofar as the plaintiffs mean to argue that Dr. Brau's report sets forth an expert opinion that Dr. Toledo performed the surgery negligently, it does not.

Dr. Brau did state in the report that Dr. Toledo's "[m]anipulation of [the] AICA or its perforator[] vessels could have trigger[ed] [a] vasospasm," which could have created an interruption in blood flow and "eventually evolv[ed] into an infarction," or tissue death. But, Dr. Brau also stated in that same report that this "manipulation of the blood vessels" could not "be avoided" because the "operation is designed to mobilize blood vessels away from the facial nerve." So, Dr. Brau's report does not indicate that such manipulations were of the avoidable kind that the plaintiffs, implicitly, contend that he agreed that they were.

Moreover, nothing in Dr. Brau's report provides support for the plaintiffs' assertion that Dr. Toledo's conduct in performing the surgery was so patently negligent that no expert opinion to that effect is needed for their negligence claims to be able to survive summary judgment. And, finally, we see no basis for concluding that a "lay" juror "relying on common knowledge and

experience" can "infer," <u>Rolon-Alvarado</u>, 1 F.3d at 79, either that the manipulations caused the injuries or, insofar as they did, that they were the product of a deviation from the applicable standard of care (even assuming that standard to be one that would require that Dr. Toledo "identify, isolate, and protect the nervous tissue and vascular (circulation) in the affected area").

Finally, insofar as the plaintiffs mean to rest their contention that the exception recognized in <u>Rolon-Alvarado</u> should apply on their allegation in their complaint "that Defendants were 'grossly negligent' because they did not provide Mrs. López with adequate neurological evaluation and treatment during her surgery and stay" at the hospital, and failed to provide the treatments "'required to diagnose and/or avoid a massive stroke,'" they are wrong to do so. Without more, these "mere allegations are not entitled to weight in the summary judgment calculus." <u>Borges</u>, 605 F.3d at 3.

### III.

The judgment of the District Court is therefore **<u>affirmed</u>**.